**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| In re: Case No. A10-00414-DMD<br><br>ROBERT A. SCOTT and SYLVIA K. SCOTT,<br><br>Debtors. | Chapter 7<br><br>**Filed On**<br>**11/15/11** |
| RONALD MILLER and LINDA MILLER,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT A. SCOTT, SR.<br><br>Defendant. | Adv. No. A10-90023-DMD |

**SUMMARY JUDGMENT MEMORANDUM**

The plaintiffs have filed an amended complaint objecting to the discharge of the defendant. The defendant has filed an amended motion for summary judgment. Having reviewed the motion, the plaintiffs' opposition, and the defendant's reply, and considered the entirety of the record, I conclude that the defendant's motion should be granted. This adversary proceeding will be dismissed, with prejudice, each party to bear its own costs and attorney's fees.

Background

In 1981, Robert and Kay Scott together with Jan and Debbie Marquiss started a business known as Jan's Distributing, Inc. Each couple owned 50% of the business. They sold cigarettes, snacks, jerky, water and a variety of other items as a wholesale distributor. Robert was initially a truck driver and salesman. He later controlled the company's warehouse and vehicles and managed its personnel. Jan Marquiss was responsible for the company's finances. The company did well and expanded. A second company, J B Bush, LLC, was formed to handle orders placed to bush Alaska. Jan and Robert each owned 50% of that entity. A third company, J B Rentals, LLC, was formed to buy a warehouse for the operations of Jan's and J B Bush. Jan and Robert each owned 50% of J B Rentals, as well.

Sometime late in 2006 or early 2007, Robert discovered that Jan's Distributing had more than $200,000.00 in uncollectible accounts receivable. Jan Marquiss was arrested for fraud concerning residential mortgage applications. His arrest was unrelated to his duties at Jan's Distributing. Northrim Bank was financing Jan's, J B Bush, and J B Rentals at that time. It demanded that Jan be removed from all management responsibilities. Robert and his son Bobby assumed control of all three entities in 2007. The businesses were struggling. Robert attempted to keep the doors open.

Ronald and Linda Miller were personal friends of Robert and Sylvia Scott. They learned about Jan's financial difficulties from Robert's son, Bobby. The Millers agreed to loan $100,000.00 to Jan's on December 12, 2008. They executed a "Financial Agreement" which provided:

2

> On this date, the sum of $100,000.00 will be deposited into the banking account of Jan's Distributing, Inc. by Ronald and Linda Miller. An interest rate of 2% per annum shall be paid to Ronald and Linda Miller by Jan's Distributing, Inc. until funds are transferred to the real estate fund of Jan's Distributing, Inc. in 2009. When monies are transferred to the real estate fund, a new agreement of payment will be drawn up by Jan's Distributing, Inc., attornies [sic].[1]

Robert signed the agreement as Jan's vice-president; his son Bobby executed the agreement as Jan's president. After the funds were deposited in Jan's Distributing's bank account, they were withdrawn and placed in J B Bush's bank account. All of the funds were used to pay creditors of Jan's Distributing, however.[2]

Despite this cash infusion, the financial condition of Jan's Distributing and J B Bush continued to deteriorate. In March of 2009, Northern Sales obtained a judgment against Jan's. A second judgment against Jan's was obtained in October of 2009 by Alaska Pure Water. Both creditors began execution proceedings against Jan's assets. To avoid the executions, checks payable to Jan's Distributing, Inc. were deposited into either the J B Bush account or Robert Scott's personal accounts. Robert did not personally benefit from these

---

[1] Pls.' Opp'n to Def.'s Mot. for Summ. J., filed Sept. 19, 2011 (Docket No. 40), Ex. 1.

[2] *See* Second Aff. of Beverly Gonzales, filed Aug. 8, 2011 (Docket No. 38-1), and the summaries thereto (Docket Nos. 38-2, 38-3).

transactions; the business expenses paid from his personal bank accounts exceeded the amount of business deposits placed into them.[3]

The Millers received two payments on the loan they had extended, one for $5,000.00 in August of 2009, and the other for $3,000.00 in October of 2009. They had expected to receive an interest in rents from "Jan's warehouse" but this did not happen.[4] In January, 2010, the Millers sued Jan's Distributing and Robert to collect on their loan. They also filed a lis pendens against the warehouse. The warehouse was sold on January 15, 2010. The Millers received $22,000.00 from the sale in exchange for a release of their lis pendens. Robert and J B Bush also signed a promissory note for $74,000.00 in favor of the Millers. Robert received $89,047.78 from the sale of the warehouse. He deposited the proceeds in a personal account at Alaska USA and used them to pay creditors of Jan's and J B Bush.

Robert had three personal accounts at Alaska USA Federal Credit Union. He used them to pay Jan's and J B Bush obligations. Robert deposited $226,814.02 in business receivables into account #*2586 and paid out $316,330.40 in business expenses for Jan's Distributing and J B Bush from December of 2008 through June, 2010.[5] For account #*7234, a total of $50,750.00 in business checks was deposited and $61,805.11 in business

---

[3] Aff. of Robert Scott & Beverly Gonzales in Supp. of Mot. for Summ. J., filed Mar. 18, 2011 (Docket No. 16-1), at 2; Aff. of Robert Scott & Diane Marquiss in Supp. of Mot. for Summ. J., filed Mar. 18, 2011 (Docket No. 16-2), at 3.

[4] Aff. of Ronald and Linda Miller, filed Apr. 11, 2011 (Docket No. 19-3), at 3.

[5] Aff. of Scott & Marquiss (Docket No. 16-2), at 3.

4

expenses were paid from June, 2009 through June, 2010.[6] In the third account, #*8861, $7,266.86 of business checks were deposited and $13,345.15 in business expenses were paid from June, 2009 through May, 2010.[7]

The businesses failed in May of 2010. Robert Scott and his wife filed a joint chapter 7 petition on May 17, 2010. The Millers initiated this adversary proceeding against Robert only on September 14, 2010. Their original complaint contained a number of general allegations of wrongdoing by Robert and pled for relief under 11 U.S.C. § 727.[8] They alleged Robert was not entitled to a discharge because he had, "with intent to hinder or defraud Plaintiffs," transferred, removed or concealed property of the debtor, including "commercial vehicles used when Jans's Distributing, Inc. was still in business and thereafter."[9] They also alleged that Robert had concealed or failed to keep adequate financial records, in that he had used numerous commercial and personal bank accounts to channel funds from the three businesses and it was impossible to tell whether the funds were used to pay creditors.[10] Finally, they alleged that Robert had made false statements at his § 341 meeting regarding the transfers of a van by J B Bush and four commercial trucks by Jan's

---

[6] Aff. of Scott & Gonzales (Docket No. 16-1), at 2.

[7] *Id.*

[8] Pls.' Compl. to Deny Discharge, filed Sep. 14, 2010 (Docket No. 1).

[9] *Id.* at 6.

[10] *Id.* at 7.

5

Distributing, and that Robert been unable to explain the transfers in and out of his personal accounts.[11]

Robert moved for summary judgment on March 18, 2011. Oral argument on the motion was held on May 6, 2011. At the hearing, the Millers' counsel advised the court that he had received three boxes of bank records and other documentary evidence from the defendant's counsel on January 25, 2011. He said that by the time he had the opportunity to review these records, the deadline for amending pleadings had expired.[12] Robert's counsel had agreed to produce these records at a continued meeting of creditors held on August 17, 2010. Due to the prolonged period of time that had elapsed between the meeting of creditors and the production of the documents, I gave the plaintiffs a 30-day window to seek leave to file an amended complaint to plead relief under § 727(a)(2), (a)(3) and (a)(4). I cautioned their counsel that the amended complaint should avoid conclusory allegations and contain specific facts to support each alleged violation of § 727. The defendant's motion for summary judgment was continued without date.

The Millers moved for leave to file an amended complaint on June 6, 2011. Robert filed a non-opposition and the motion was granted. Robert then filed an amended motion for summary judgment which addresses the three counts in the Millers' amended complaint.

---

[11] *Id.*

[12] February 18, 2011, was set as the deadline for amending pleadings in this court's Order Setting Trial Date and Related Deadlines, entered on Nov. 3, 2010 (Docket No. 12).

6

Analysis

Fed. R. Civ. P. 56, made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 7056, provides that summary judgment should be entered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."[13] The moving party has the burden of showing that there is no genuine dispute as to any material fact for trial.[14] To defeat a motion for summary judgment, the nonmoving party must establish the existence of material factual issues by producing evidence that would support a jury verdict in its favor.[15] A genuine factual dispute exists if, "viewing all the evidence in the light most favorable to the nonmoving party, a reasonable fact-finder could decide in that party's favor."[16] However, if the nonmoving party fails to produce sufficient evidence to support a judgment in its favor, there is no need for trial and summary judgment may be granted.[17]

A party objecting to discharge bears the burden of proving, by a preponderance of the evidence, that the debtor's discharge should be denied.[18]

---

[13] Fed. R. Civ. P. 56(a).

[14] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[15] *Id.*

[16] *Joye v. Calif. Franchise Tax Board (In re Joye)*, 578 F.3d 1070, 1074 (9th Cir. 2009), *citing Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 707 (9th Cir. 2008).

[17] *Anderson*, 477 U.S. at 249.

[18] *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010).

7

> "In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." This does not alter the burden on the objector, but rather means that "actual, rather than constructive, intent is required on the part of the debtor."[19]

The general factual allegations in the amended complaint aver that Robert made fraudulent misrepresentations to the Millers when they agreed to extend a loan to Jan's Distributing in 2008. These allegations would more appropriately be the basis for a complaint objecting to discharge of debt under § 523(a)(2). Given that the statute of limitations has long expired, the Millers are now foreclosed from seeking such relief.[20] Further, these allegations are not germaine to the § 727 counts asserted in the Millers' amended complaint. They involve a transaction well outside the one year period found in § 727(a)(2)(A), and are not pertinent to relief under § 727(a)(3) or (a)(4). They will not be considered in the context of the pending summary judgment motion.[21]

The Millers' amended complaint contains three counts under § 727. Robert seeks summary judgment as to all three. Count I attempts to state a claim for relief under

---

[19] *Id.* (citations omitted).

[20] The Millers, the chapter 7 trustee and the United States Trustee obtained an extension of time, until September 30, 2010, to file complaints to deny discharge. *See* Ex Parte Order Extending Time for the U.S. Trustee to File a Complaint to Deny Discharge, entered Aug. 10, 2010 (Docket No. 18), and Order entered Aug. 11, 2010 (Docket No. 23), in Main Case No. A10-00414-DMD. Only the Millers filed a § 727 action. Neither the chapter 7 trustee nor the United States Trustee have joined this adversary action.

[21] The applicable substantive law identifies which facts are material, and only disputes over facts which might affect the outcome of the suit under governing law will preclude entry of summary judgment. *Anderson*, 477 U.S. at 248. A debt incurred through a debtor's fraudulent representations may be excepted from discharge under § 523(a)(2) but this conduct, alone, is not a basis for the broader denial of discharge under § 727.

8

§ 727(a)(2)(A) and (B), and contains just two substantive paragraphs. In spite of my admonitions to the plaintiffs' counsel, Paragraph 15 essentially reiterates the statute.[22] Paragraph 16 of the complaint states:

> 16. The documents that Defendant removed and/or concealed establish, among other things, that he transferred or had others transfer money from the accounts of his various businesses into the personal accounts of he and his wife and from there he transferred or had others transfer the money via checks for case or debits. This included the money loaned by Plaintiffs.[23]

This vague paragraph is certainly not what I had in mind when I extended the time for the Millers to file an amended complaint. The documents which were purportedly removed or concealed are not identified. There are no specific factual allegations which would support veil-piercing or alter ego, nor are there any specific factual allegations which would support a finding of a fraudulent transfer by the debtor.

Here, Robert admits transferring numerous of the receivables of Jan's and J B Bush into other accounts to avoid execution efforts by Jan's creditors, Northern Sales and Alaska Pure Water. However, these receivables were not "property of the debtor" as required by § 727(a)(2)(A), nor were they "property of the estate" under § 727(a)(2)(B). The

---

[22] The Millers allege Robert has violated § 727(a)(2)(A) and (B) because "with the intent to hinder, delay and/or defraud," he "removed, and/or concealed property of the debtor within one year before the date of the filing of his bankruptcy petition and property of the estate after the filing of his bankruptcy petition." First Am. Compl., filed Jun. 9, 2011 (Docket No. 32) at 3-4.

[23] First Am. Compl. (Docket No. 32), at 4.

9

weight of authority holds that a fraudulent transfer of corporate property does not constitute grounds for denial of discharge in an individual's case.[24] As noted by the Tenth Circuit:

> MBank has cited no authority, and we have found none, which holds that the transfer of property of another which has incidental effect upon the assets of a debtor satisfies the requirements of § 727(a)(2)(A). . . .
>
> The words: "Property of the debtor," are not the same as "property in which the debtor has a derivative interest." To the contrary, the language of the statute is sufficiently circumscriptive to eliminate such an interpretation. . . .
>
> . . . .
>
> Congress intended to limit the reach of § 727(a)(2)(A) only to those transfers of property in which the debtor has a direct proprietary interest. MBank's argument to the contrary is creative, indeed ingenious, but it is not persuasive, and the district and bankruptcy courts correctly so concluded.[25]

Robert Scott's transfers of Jan's and J B Bush receivables were not transfers of property of the debtor or the estate within the meaning of § 727(a)(2)(A) or (B).

---

[24] *MCorp Mgmt. Solutions, Inc. v. Thurman (In re Thurman)*, 901 F.2d 839, 840-41 (10th Cir. 1990); *Lort v. Ferguson Enter., Inc. (In re Lort)*, 347 B.R. 909 (M.D. Fla. 2006); *N.E. Nebraska Econ. Dev. Dist. v. Wagner (In re Wagner)*, 305 B.R. 472 (B.A.P. 8th Cir. 2004); *BPS Guard Serv., Inc. v. Myrick (In re Myrick)*, 172 B.R. 633, 637-38 (Bankr. D. Neb. 1994); *Riumbau v. Colodner (In re Colodner)*, 147 B.R. 90, 93 (Bankr. S.D.N.Y. 1992); *CIT Group/Factoring Mfrs. Hanover, Inc. v. Srour (In re Srour)*, 138 B.R. 413, 419-20 (Bankr. S.D.N.Y. 1992).

[25] *Thurman*, 901 F.2d at 841.

10

In their opposition, the plaintiffs argue that Robert's failure to disclose, in detail, the transfers of corporate receivables into various business and personal accounts is an inexcusable "concealment" of records which would justify denial of his discharge.[26] They argue that if Robert "had disclosed the whole picture during the proceedings it might very well have changed the dynamics of the case," and "the fact that some of the commingled money may have been used to pay Jan's creditors . . . does not excuse the violation of the statute."[27] This argument is meritless. Robert discussed the transfers at his § 341 meetings and has produced all the financial records that the Millers requested. The Millers do not say exactly what records Robert has concealed, nor do they explain how the case dynamics were affected by his actions. More than conjecture is required to withstand a summary judgment motion. At this point in the case, the Millers must support their contentions with specific evidence. They have not.

Belatedly, the Millers argue that the defendant's discharge must be denied on a veil-piercing or alter ego theory. They argue that "since [Robert's] various companies were nothing more than his alter ego, the money [that was transferred from the business accounts] was, in actuality, his and should have been part of the bankruptcy estate."[28] This theory was not alleged in the Millers' amended complaint. They have had more than a year since this

---

[26] Pls.' Opp'n (Docket No. 40), at 9-10.

[27] *Id.* at 10.

[28] *Id.*

11

adversary action was commenced and more than nine months now to review the three boxes of financial documents they requested from Robert. It is no time for new theories of the case.

Further, as noted above, objections to discharge under § 727(a) are to be construed liberally in favor of the debtor and strictly against a person objecting to the discharge.[29] The statute does not provide for denial of discharge under a veil piercing or alter ego theory, and research reveals scant authority on this point.[30] In one case from this district, *Compton v. Bonham (In re Bonham)*,[31] Judge Ross denied a debtor's discharge based upon fraudulent transfers made by two related corporations. RaeJean Bonham operated a Ponzi scheme through her corporations, World Plus, Inc. and Atlantic-Pacific Funding Corp. She used the corporations for illegal and fraudulent purposes in violation of state and federal securities laws. The corporations were substantively consolidated with her individual case. They had also been disenfranchised by their respective states months before the bankruptcy.

I regard *Bonham* as an exception to the majority rule, discussed above, that fraudulent transfers of corporate property are not grounds for denial of discharge in an individual's case. The facts in *Bonham* were egregious. *Bonham* is distinguishable from the

---

[29] *Retz*, 606 F.3d at 1196; *see also Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1342 (9th Cir. 1986); *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 754 (9th Cir. 1985).

[30] The two cases cited by the Millers to support their alter ego theory are not persuasive. The first "is *not* about corporate veil-piercing, or even about reverse corporate veil-piercing," but is instead about successor liability. *Carter Enter., Inc. v. Ashland Specialty Co., Inc.*, 257 B.R. 797, 800 (S.D. W.Va. 2001) (emphasis in original). In the second case, the corporate veil was pierced to find the principal of a *corporate* debtor personally liable for the debts of the estate, where the principal had used corporate assets for his personal benefit. *Kittay v. Flutie New York Corp. (In re Flutie New York Corp.)*, 310 B.R. 31 (Bankr. S.D.N.Y. 2004). Here, we are not dealing with a corporate debtor. Further, Robert did not use corporate assets for his personal benefit.

[31] 5 A.B.R. 402, 224 B.R. 114 (Bankr. D. Alaska 1998).

instant case for several reasons. Robert did not operate a Ponzi scheme, nor did he otherwise personally benefit from the fraudulent corporate transfers. All of the funds transferred from the corporate accounts of Jan's or J B Bush ultimately went to pay for corporate debts. Additionally, Robert contributed the entirety of the funds he received from the sale of the warehouse, $89,000.00, to pay corporate creditors. There has been no substantive consolidation of the respective entities; Jay's and J B Bush have never been placed in bankruptcy. There has been no criminal conspiracy or a violation of federal and state security laws. *Bonham* is an extreme case that does not apply here. This court will not enlarge § 727(a) to encompass the plaintiffs' theory.

With regard to Count I of the amended complaint, there is no genuine dispute as to any material fact. The uncontroverted evidence establishes that corporate receivables were transferred to various bank accounts, including some of Robert's personal accounts. The evidence also establishes that the transfers were done to avoid execution efforts by certain corporate creditors. There is nothing to infer that Robert personally benefitted from these transfers, nor can the Millers offer more than conjecture regarding Robert's alleged concealment of records. Given the state of the evidence, under my view of the law there is nothing to support the plaintiffs' alter ego theory. Summary judgment for the defendant is appropriate as to this count.

Count II of the amended complaint seeks relief under § 727(a)(3). The Millers allege that Robert failed to keep or preserve adequate financial records from which his financial condition or business transactions might be ascertained. Paragraph 19 of the

13

amended complaint alleges that Robert produced several boxes of documents which proved this "more than a month after receiving his bankruptcy discharge."[32] Paragraph 20 of the amended complaint says that the "various documents produced more than a month after [Robert's] discharge" establish that Robert transferred money from business accounts into personal accounts and that "from there he transferred or had others transfer the funds via checks for cash and debits. This money included the money loaned by Plaintiffs."[33]

Count II relates specifically to the delay of Robert's counsel in producing copies of financial records which were promised to the Millers at the final creditors' meeting held on August 17, 2010.[34] The Millers' counsel did not receive these records until January, 2011. Given that the Millers were granted an extension of time to seek to amend their complaint after these documents were produced, it is difficult to see how they were prejudiced by this delay. Further, Count II erroneously references the entry of Robert's discharge as a significant point. He has not yet received a discharge in this case, and the Millers' counsel was informed of this twice before the amended complaint was filed.[35]

---

[32] First Am. Compl. (Docket No. 32), at 4.

[33] *Id.*

[34] The trustee did not seek additional records from Robert and filed a Report of No Distribution three days after the § 341 meeting was concluded, on August 20, 2010.

[35] Robert's discharge was entered in error on December 1, 2011, contemporaneously with his wife's discharge. *See* Discharge of Debtor, entered Dec. 1, 2010 in Main Case No. A10-00414-DMD (Docket No. 31). After this error was discovered, an order vacating discharge was entered. *See* Order Vacating Discharge of Robert Scott Only, entered May 4, 2011, in Main Case No. A10-00414-DMD (Docket No. 33). The plaintiffs' counsel was advised of this at the earlier summary judgment hearing held on May 4, 2011, and was also served with a copy of the order vacating discharge. *See* BNC Certificate of Notice, filed May 6, 2011, in Main Case No. A10-00414-DMD (Docket No. 34).

14

Nonetheless, in their opposition the Millers argue Robert's discharge should be denied because he "neglects to explain why he failed to produce the three banker's boxes . . . until well after his December 1, 2010 discharge."[36] They say this delay made it impossible for them and for the chapter 7 trustee to get "the whole story" about the transfers until after the discharge was entered.[37]

> "The purpose of [section 727] is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." The initial burden of proof under § 727(a)(3) is on the plaintiff. "In order to state a prima facie case under section 727(a)(3), a creditor objecting to discharge must show (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." Once the objecting party shows that the debtor's records are absent or are inadequate, the burden of proof then shifts to the debtor to justify the inadequacy or nonexistence of the records.[38]

Considering that Robert's discharge has not yet been entered, it is difficult to see how the delayed production of records has prevented the Millers from getting "the whole story" about his financial transactions. The Millers do not say that what records Robert has concealed or failed to produce. They do not say the records Robert has produced are inadequate. Robert never denied the transfers of corporate receivables between the various

---

[36] Pls.' Opp'n (Docket No. 40), at 11-12.

[37] *Id.* at 12.

[38] *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994) (citations omitted).

15

bank accounts, and the records he produced detail these transfers. The Millers offer no specifics to support Count II except that three boxes of records were provided after some delay. They fail to make a prima facie case for relief under § 727(a)(3). Summary judgment will therefore be granted to the defendant on Count II of the amended complaint.

The Millers' third count seeks relief under § 727(a)(4)(A) and (D). They allege Robert knowingly and fraudulently made false oaths in his bankruptcy and that he withheld documentary evidence from the United States Trustee. They again allege that these documents would have established that Robert transferred money in and out of both his business and personal bank accounts. The Millers' opposition clarifies that Count III is again based upon Robert's delay in producing the three banker's boxes of documents – documents "that evidenced the fact that his companies were nothing more than his alter egos, that he was commingling money and had been for years, and that he eventually transferred the business account funds into his personal account."[39]

To prevail on a claim under § 727(a)(4)(A), a plaintiff must show, by a preponderance of the evidence, that "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently."[40] Here, Robert disclosed the transfers of corporate receivables

---

[39] Pls.' Oppn. (Docket No. 40), at 13.

[40] *Retz*, 606 F.3d at 1197, *citing Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (B.A.P. 9th Cir. 2005).

16

at his § 341 meeting.[41] He has produced substantial financial records regarding Jan's, J B Bush, and his personal accounts at the Millers' request. He has also submitted detailed affidavits and exhibits which account for the transfers of corporate funds and the payment of corporate debts.[42] In opposition, the Millers offer copies of several months of J B Bush bank statements and copies of several cancelled checks, without any forensic analysis.[43] They do not rebut the debtor's more detailed accounting. The burden is on the Millers to show that a false oath was made, or that the debtor knowingly and fraudulently "withheld from an officer of the estate . . . any recorded information . . . relating to the debtor's property or financial affairs."[44] They cannot withstand Robert's summary judgment motion with general allegations and a reiteration of the fact that transfers were made.

      I find the Millers' lack of specifics inexplicable, considering the amount of time that has elapsed since the financial records were produced. Their false oath theory has morphed from their original complaint, wherein they alleged Robert made false oaths concerning the transfer of a van and four commercial trucks which had belonged to the corporations. Those allegations were not included in the amended complaint, which generally avers that false oaths were made regarding the transfer of money. Robert has provided detailed evidence that not only shows that funds were transferred but also

---

[41] Ex. 6 to Pls.' Opp'n (Docket No. 40-7) (Transcript of § 341 Meeting held Aug. 17, 2010).

[42] Aff. of Scott and Gonzalez (Docket No. 16-1); Aff. of Scott and Marquiss (Docket No. 16-2); Second Aff. of Gonzales (Docket No. 38-1) and supporting documentation (Docket Nos. 38-2, 38-3).

[43] Exs. 8 and 9 to Pls.' Opp'n (Docket Nos. 40-9, 40-10).

[44] 11 U.S.C. § 727(a)(4)(D).

17

establishes that all corporate receivables paid corporate debts. He has a right to know what specific oath is in controversy so that he can prepare an appropriate defense. Given the plaintiffs' inability to do so at this late stage of the proceedings, summary judgment in favor of Robert on Count III is appropriate.

For the foregoing reasons, the defendant's motion for summary judgment will be granted. The plaintiffs' amended complaint will be dismissed, in its entirety, with prejudice, each party to bear its own attorney's fees and costs.

An order and judgment will be entered consistent with this memorandum.

DATED: November 15, 2011

> BY THE COURT
>
> /s/ Donald MacDonald IV
> DONALD MacDONALD IV
> United States Bankruptcy Judge

Serve: E. Brown, Esq.
       E. LeRoy, Esq.

        11/15/11